Mr. Shipman, good to see you, sir. Good morning, Your Honor. May it please the Court, my name is Gary Shipman. I represent the plaintiff's appellants. In this litigation between purely private parties, dismissal of the plaintiff's claims based upon its June 2009 claims involving negligent misrepresentation in reports by SRI were improper. The relevant standard here is the standard for the conduct of in vitro virological assays. It is not a CRO standard. The relevant scientific community is the HIV AIDS research community, not a CRO. This is not a case about limited funding, this is a case about limited knowledge. It is without dispute that the scientist assigned by SRI to this matter did not know that the gold standard for the conduct of in vitro virological assays testing the very mechanism of action that was at issue in this case was PBMCs. It is without dispute that SRI made assumptions that these assays would operate the same across two cell lines, and it is likewise without dispute that there is absolutely, positively, no factual or scientific support for that assumption. It is without dispute that no efforts were made to do any research by the scientist that was assigned to this project to support that assumption. There is no dispute that when the decision was made by whoever it was made to change cell lines, that no warnings were given by SRI, the expert, that a change in cell lines would lead to what in fact happened here. Let me start from a fundamental place for me. This is a negligent misrepresentation claim, at least with respect to the false negative. I think we're talking about the same thing there. What is the misrepresentation? Start at the very baseline. Negligent misrepresentation case. What is the misrepresentation? That there were negatives when in fact they were positive had the gold standard, had the standard of care for the conduct of in vitro virological assays, had the state of the art as they were obligated to do been followed, the PBMC assay would have been performed and those negatives would not have been negatives. They would have been positives. And that misrepresentation that you're alleging, this is the June 2009 report, right? That was the first misrepresentation followed by a subsequent assurance. I want to focus on the false negatives part first. That's the June 2009 report, right? The challenge that I've got, and I'm looking at 4577 of the joint appendix, but that's the June 2009 report. And it doesn't say anywhere in there that there were negatives, right? What it says instead is it said these are the ones that were hit, quote, NCEMSSS cells. So it identifies precisely the test that was done, and it says with respect to the examples that you've got, right, which is 154 and 156, right? It goes through and it says on this table NCEMSS cells, not the gold standard, but the standard that they represented to you they were using. It says they didn't hit there. Yes, sir. Right? So what I can't understand is how that is at all a misrepresentation to you because it tells you exactly what they did. And if you thought CEMS was a bad idea, right, or you thought that you wanted something other than CEMS, right, you certainly had the ability to ask for that. But they told you exactly what they did, and there's no misrepresentation that if you did a different test, you might have come up with a different result. First, we did not have control of this assay. It was done pursuant to a contract with NIAH and SRIB. It is SRI that had exclusive control over the means and the methods. It was SRI that was supposed to use state-of-the-art techniques in undertaking this virological assay to test this particular mechanism of action. They were required to have sufficiently qualified and trained personnel. And you may well, not here, but you may well have a contract claim that they didn't live up to their contract. But what I'm asking you about is a negligent misrepresentation claim. What you're saying is they misrepresented what they were telling you, but they say it in big, bold letters. I mean, it's at the top of the page, right? Compounds against HIV-1 in CEM-SS. They tell you exactly. Maybe you've got a contract claim. That's fine. We can talk about that in a minute. What I want to know is how is that a misrepresentation to you? Because of their representation that they were undertaking and had performed those assays, pursuant to the obligation to use state-of-the-art techniques in testing this unique mechanism of action in in vitro virological assays. It's a negligence claim. They were negligent in failing to conduct. All right, but we can talk about negligence or contract claims. I just want to make sure you agree that this isn't a misrepresentation, though. When they tell you that 154 and 156 do not hit against the CEM-SS, that's not misrepresenting that they would have hit against the PBMC. They're telling you exactly, factually accurate that 154 and 156 do not hit against CEM-SS. Yes, sir, but it is a scientifically irrelevant finding, given what they were charged with doing. Second, again, there are two contracts here. There is one contract between SRI and TRNA for SRI to use its drug discovery technology, and then there is the separate contract from where the tort duty flows between SRI and NIAID to perform in vitro virological assays. So there was no contract for the performance of in vitro virological assays, Judge Richardson, between SRI and TRNA. The contract, which did not allocate risk of loss, that does not contain and is not a good, information is not a good, it does not allocate loss between these parties in the contract for SRI to utilize TRNA's proprietary drug discovery technology. The separate contract is what the duty flows from. This is not a contract claim. That was a contract with the government. Yes, sir. Your contract with the government. We do not have. No, no, sir. TRNA never had a contract with the government. SRI had a contract with the government. All right. That is where the duty to perform that contract, not negligently, flows to TRNA. In the performance of that contract between SRI and NIAID using our technology, that is where the tort duty arises from. There is no contract claim here. And the only reason that the debate exists about whether it is a contract claim or whether it is a tort claim is because of the plaintiff's claims of negligent misrepresentation. That's the only reason why the debate arises. It is clear that the fact that there is a contract in which, according to SRI, according to allegations of the plaintiff, that we, TRNA, are a third-party beneficiary, that matters not as it pertains to whether or not the plaintiff has a claim for negligent misrepresentation. But how about you just told me that you agree it's not a misrepresentation? No, sir. I did not say that. I said that the statement that they made that what did not test positive in CEMs was a true but scientifically irrelevant statement given the obligation that was imposed upon SRI to use state-of-the-art techniques to test this mechanism of action. And where does that obligation come from? What's the source of that obligation? The contract between SRI and NIAID. You're not a part of that contract, though, so you can't enforce the contract, right? Yes, sir. We're not trying to enforce that contract. We're trying to enforce the duties of the contract. No, sir. We're trying to enforce the promise to perform the contract in a manner that does not injure TRNA. That is the nature of negligent misrepresentation claims. That's the Raritan Steelcase. That is Section 552 of the restatement that makes it abundantly clear that our status vis-a-vis the contract with NIAID does not preclude a claim in tort because the courts have looked at the policy reasons behind that, Judge Richardson, to encourage that parties like SRI perform their obligation in a non-negligent fashion to protect their parties. But the negligent misrepresentation claim, you agree, requires a misrepresentation. Yes, sir. What is the misrepresentation precisely in this claim? That these in vitro virological assays were performed in accordance with state-of-the-art techniques. And where in the record is that statement? It's in the contract. It's repeated throughout our briefing that they were, it indeed is the nature of Dr. Weinberg's testimony. I don't want to know where it's in the briefing. What I want to know is where, I want to know specifically where in the record, and you can bring it back up on reply if you like, where that statement that you claim is a misrepresentation, where is that statement that you're relying upon for a negligent misrepresentation claim? The references in the report, the published report, the June 2009 report, reference the NIAID contract under which that assay was performed, whose provisions require that in performing, testing this particular mechanism of action, that they use state-of-the-art techniques and they have sufficiently qualified personnel. And they didn't. They didn't have sufficiently qualified personnel. They did not use state-of-the-art techniques. And there's no substantial dispute in the record about that at all. So are those expressed words in the report? No. But the contract that is a matter of public record that contains those provisions are. And there is no dispute. No contention has been made that they were not obligated to use state-of-the-art techniques. Mr. Shipman, can I ask you a question about the damages component of your claim? You've got evidence in the record from an expert, and this has to do with the false negative claim, this first one, who estimated the probability of your client securing a licensing deal once they got through the due diligence stage. And I get that. But the problem I have, I think, with that analysis is that apparently the expert did not account for the fact that these compounds had, in fact, been tested by other licensees at the beginning of this process and yielded, as the record shows, unimpressive results. And so how can it be, then, that you've shown a reasonable certainty of damages with respect to what is inherently a very uncertain enterprise to begin with? First, this is exactly what Michael Mischke-Reed does for Big Pharma and CROs and biotech companies. He values the intellectual property, the compounds that they have acquired. He indicated in his testimony that at the point in time when the false negatives were discovered, and even thereafter when they were discovered, they had gotten past the initial gatekeeping function. For instance, when the false negatives were discovered in 2012, Dr. Buckhite, the head of his own CRO, thought that those false negatives were of sufficient efficacy where, A, he invested his CRO's additional money in performing analog studies. Second, he sought funding that by that point in time had dried up for this new novel mechanism of action. So both Mischke-Reed and Dr. Buckhite established the window of opportunity that closed. That had these false negatives been reported out as positives in 2009, there was a market, there was funding for this novel mechanism of action that did not exist. Right, in the abstract. But then you've got this evidence that suggests that with respect to these compounds, they weren't doing all that well. They hadn't been tested, they'd been tested, and they had yielded unimpressive results. So isn't the expert supposed to account for that? And he testified, Judge Diaz, that he did. That he accounts for the fact that there may not be success that in order for these compounds to have value, and as importantly, understand there were two components of value. Value of our drug discovery technology, that indeed it would do what we advocated it would do, but then the value of the compounds. Now, he indicated that all of these have value. The fact that they never make it into a druggable compound or into a drug does not mean that they don't have value. Does not mean that Big Pharma does not buy them to shell them to use for some other purpose. He explained every bit of that, and Judge Diaz, we believe he absolutely accounted for the fact that they may never get there. All right. Be happy to answer any other questions we have. Are you challenging anything that arises from Judge Fox's opinion in 2014? Is everything coming out of Judge Boyle's rulings? Everything from which we seek appeal comes out of Judge Boyle's dismissal of the June 2009 claims, the June 2010 claims, his exclusion of Dr. Weinberg. Okay. Thank you. Thank you very much. You're saving some time back. Mr. Lester. Nice to have you here, Mr. Lester. Thank you for having me, Your Honor. May it please the Court, my name is Jay Lester, and I represent the Appley, in this case, Southern Research Institute. I'm going to start with the three questions asked by this panel. The first question asked by Judge Diaz was, did Mishka Reeds account for the fact that these compounds Diaz, by the way. Diaz, my apologies. And on page You weren't the first one to do that. On page 6584 of the record, Mr. Mishka Reeds expressly admits that he did not take into account the fact that there was substantial evidence in the record that these compounds exhibited weak, if any, antiviral activity. And that is absolutely important to Tranna's claim under the false negative theory. If they cannot show non-speculative damages, they cannot state a claim. Going to Judge Richardson's point about was there a misrepresentation, Judge Richardson, you hit the nail on their head. There is no misrepresentation at issue here. All Southern represented was that it had performed CEMSS assays. That's all that was in the June 2009 data report. It is undisputed that Southern properly performed those assays. So there is no negligent misrepresentation whatsoever. Now, Tranna's counsel says that, well, they may not have performed state-of-the-art assays. That comes directly from the NIH contract. Southern was not sued in contract. They were sued for negligent misrepresentation. Even if you take Tranna's statements that Southern negligently performed the research, that's not a claim for negligent misrepresentation. That would be a claim for negligence. And that goes to your question, Judge King, which is has any issue been appealed from Judge Fox's decision? Judge Fox dismissed all negligent claims as a matter of law under the statute of limitations. For that very reason, which is not being appealed here today, there cannot be a claim for negligent. It has to be a misrepresentation. And the only representation that Southern made in the June 2009 data report was that it would run CEMSS assays. And, in fact, if you even look at the future direction section of the June 2009 data report, which is at page 1,566 of the joint appendices, it states that in the future Southern will perform the PBMC assays on those hits from the CEMSS assays. That is exactly what Tranna is claiming Southern should have done, is run the gold standard assays on the hits from CEMSS assays. And that's exactly what Southern did. In November of 2010, Southern ran PBMC assays, the gold standard assays, on three hits from the June 2009 data report. Therefore, you don't have to get to Dr. Weinberg. You don't have to get to justifiable reliance. You don't have to get to Boyle or Yearsley. All you have to find is that there was no misrepresentation in this case, and the undisputed facts establish that. But this court could just as easily affirm on the lack of evidence of damages. Dr. Shinazi, who's a world-renowned expert in HIV, found that hits number 154 and 156 exhibited no antiviral activity at all in PBMC assays, the gold standard assays. What Tranna would lead you to believe is that a pharmaceutical company, after 2012, would make the exact opposite decision that it made after 2012, that it would make the exact opposite decision before 2012. And that is spend millions of dollars on compounds that do not exhibit antiviral activity in the quote-unquote gold standard assay. That is the type of speculation that cannot survive a motion for summary judgment. Talk to me for a second about the false positives, because there does seem to be a misrepresentation there. When you talk about 46 and 182, there's a statement that these were hits, and I think we all acknowledge now that they were not hits. Right? So that is a misrepresentation, right? Yes, we do not disagree with that. And so what I want to ask you about there is, and really this is maybe more for your colleague, but I'll ask you as well. Was there evidence in the record of when patents were filed on 46 and 182? No, Your Honor. Tell me why that matters. So in November of 2010, in that data report in November of 2010, Southern Research performed PBMC assays on hit number 46 and hit number 182 and found that they did not exhibit antiviral activity in those compounds. And so it is our position that any patents that were filed after November of 2010, you could not reasonably rely on that CEMSS data, which TRANA concedes is inferior to the PBMC data, which found that the compounds were inactive. And that's why that matters. Now, in its brief, TRANA says, well, it was basically induced to continue relying on that data, but it's important to look at the actual record citation of what they claim was this inducement to continue relying on the CEMSS data. And that's at page 5,600 of the joint appendices. And this is an email from Dr. Patak or Mr. Patak from Southern Research. Mr. Patak states in December of 2010, these compounds, so that's the false positive compounds, do not have potential for further development. Rather, given the CEMSS data, these compounds will only serve as possible probes to identify other compounds that may have better specificity and greater therapeutic indices. This statement cannot support TRANA's claim that it was induced to rely upon the PBMC data to file patents on those two false positive compounds when both in November and December they were told those compounds are not worth further development. And just so I'm clear, your view is the record does not reveal evidence that there were any patent applications filed prior to this December 17 email? There were patent applications that were filed before then. In TRANA's interrogatories, they provide a list of the patents that were filed, and there are some that predate those dates. But what about on 46 and 182? We don't know. That's not in the record. So there's no record that they filed on 46 and 182 prior to December of 2010, after which they could not possibly have relied on this statement? The only record evidence that patents were filed on those two compounds comes from the declaration of Mr. Edward Gallagher, which the district court struck, and that's not appealed before this court today. But even putting aside that, even if we look at that, that also doesn't give us the answer as to whether 46 and 182, when they were filed, or frankly, if they were filed. It actually does state that patents were filed on those two compounds, but it does not give a date. You're correct about that. If you all have no further questions, you all had a busy morning. I'm happy to cede the rest of my time. Thank you, sir. Thank you. Appreciate it. Mr. Shibman? If you would, will you start with the last point here when we're talking about the false positives? What is the evidence in the record that patent applications were filed on 46 and 182 prior to December the 17th of 2010? The deposition testimony that they were filed after the November 2010 report. I'm sorry, say that again? Sure. The deposition testimony of the same individual that provided the affidavit, that in reliance upon the November 2010 report and the press releases that SRI co-authored with TRANA thereafter, the subsequent assurances after December 2010 that they could rely upon the results that were contained in the November 2010 report. I just want to make sure I'm clear. You agree that there were no patent applications filed on 46 and 182 prior to the November 2010 report? I cannot state, Judge. I'm saying they were filed after the November 2010 report. Whether they were filed in November, December, or January, they were filed after that report. What is the record support for that fact? The deposition testimony of the individual whose affidavit was stricken, containing only the precise dollar amounts that he testified to approximately that they had expended to get those worthless patents. Now, the exact date, it may be that those patents are actually, Your Honor, in the record. I can't cite that to you, but the deposition testimony made clear that it was after the report, whether it was in December, November, January. Your Honor, I'm not sure as to when, but it is important. This is Mr. Gallagher. Yes, sir. And so when he's asked the question about what's the time frame in which they were filed, he said somewhere between 2010 and 2012. Yes, sir. When you're referring to that's providing the answer of when they were filed. After, right, the November 2010 report. Well, he didn't even say that, actually. He just says 2010. Well, the context is they were talking about that 2010 report when those questions were asked because that's the topic of conversation on those patents. So you agree it's at least after the November 2010 report. Yes, sir. And sometime before the end of 2012, but there's no other evidence in the record as to when they were filed. Other than, as I say, I'm prepared to say the patents themselves may be in the record. I can't say for sure, but the answer is no, sir. But it is important to emphasize, Judge Richardson, that the repeated assurances, the press releases that were co-authored by SRI that hailed these compounds as, quote, potentially druggable. Where are those in the record? The press releases are in the record. And those are after November 2010? Yes, sir. Absolutely. And they refer to hits 46 and 182? They don't refer to them by number, but they refer to them by the number of hits that were deemed to be potentially druggable as a result of those fraudulent, we now know, June 2010. They're not referencing 46 and 182 individually is what you're telling us? Well, the report does. The report itself does. The press releases simply refer to two compounds. They don't refer to numbers, but those were the only two compounds in the June 2010 report that were ever referred to as, quote, unquote, potentially druggable. Now, a point that I want to make ad nauseum if I need to, but obviously I don't have but a minute left. The fact that we have a third-party beneficiary status enjoyed by SRI in the contract with NIAID and SRI does not mean that there is no claim, no tort claim. The common law imposes a duty of care regardless of the fact that there was the source of the undertaking was the contract between NIAID and SRI. In a negligence action, the duty sued upon is not the contractual promise. It's the duty to use reasonable care in performing that promise. Wasn't the negligence claim dismissed on statute of limitations grounds? The negligent misrepresentation claim was not because we get the discovery rule when something should be. But getting back to Judge Richardson's question, there was no negligent misrepresentation claim if, in fact, the reports indicated that they were performing the very test. They said they were going to perform. But understand that it wasn't just the report. It was conduct prior to the report in making the change. I just want to be clear that you're still – you're talking about negligent misrepresentation, not negligence when you're saying that – Yes. Okay. But given that a breach of duty is a part of the negligent misrepresentation claim, that's where Dr. Weinberg gets in in taking – and not only Dr. Weinberg, but Dr. Buckheit, SRI's own scientist, Marenta Heil, in taking issue with the methods that were used that were not designed, couldn't have been scientifically designed, to test the very thing that the June 2009 report says that they tested, the mechanism of action. Everyone agrees you would not use anything other than PBMC. So the idea that after we get positives, false positives from the CEMs, we then test in PBMCs, as the experts say, that's backwards. You test it in primary cells first because in order for a compound to progress as a druggable compound, it must show bioactivity in PBMCs. So let me ask you this. If, in fact, it's well known that this is the so-called gold standard, shouldn't your client have known that, too? They're not virologists, Your Honor. Don't you have a virologist on staff? Doesn't the record support that? Not for in vitro virological assays with HIV AIDS research, no, sir. Absolutely not. Did not. That's the reason why we licensed our drug discovery technology to the purported expert. Did not know, had no ability, had no funding to go test these compounds ourselves outside of the funding that was provided by NIAID, and we had no control over those processes. That was uniquely a process that was controlled by SRI and NIAID. I'll be happy to answer any other questions you might have. Thank you, Mr. Shipman. Thank you. We appreciate it very much. We'll come down and greet counsel and adjourn court until 4 o'clock this afternoon. This honorable court stands adjourned until 4 o'clock this afternoon. God save the United States and this honorable court.
judges: Robert B. King, Albert Diaz, Julius N. Richardson